UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN


In re:                                                    Case No. GG 14-01476-jtg

ROBERT J. CUMMINGS and                                    Chapter 13
DEBORAH R. CUMMINGS,
                                                          Hon. John T. Gregg

                          Debtors.

_____/

## MEMORANDUM DECISION REGARDING CONFIRMATION OF PLAN, OBJECTION TO CLAIM AND MOTION TO DISMISS

This matter comes before the court in connection with the confirmation of the Chapter 13 Plan, as amended [Dkt. Nos. 5, 19, 33, 77] (the "Plan"), filed by Robert J. Cummings (the "Debtor") and Deborah R. Cummings ("DCummings" and together with the Debtor, the "Debtors"), the Objection to Confirmation of the Plan [Dkt. No. 20] (the "Plan Objection") filed by Jeannette Cummings (the "Creditor"), the Creditor's Motion to Dismiss Chapter 13 Bankruptcy [Dkt. No. 40] (the "Motion to Dismiss"), and the Debtors' Objection to the Creditor's Proof of Claim [Dkt. No. 36] (the "Claim Objection"). For the reasons set forth below, the court sustains the Creditor's Plan Objection, denies confirmation of the Debtors' Plan, overrules the Claim Objection and grants the Creditor's Motion to Dismiss.

## JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (I) and (L).

## INTRODUCTION

This case involves various issues, all of which collectively amount to the re-litigation of a sixteen year old divorce in a new forum. While many requests for relief have been made by the parties in their various pleadings, the case can be distilled into two primary issues. The first is whether certain obligations arising under a mediation award and a related order from the divorce court should be characterized as domestic support obligations or as property settlements. If the obligations are in the nature of a property settlement, they are dischargeable in this Chapter 13 case. However, if they are truly domestic support obligations, the obligations are non-dischargeable and thus render the Debtors' Plan unconfirmable. The second issue is whether the Debtors' case should be dismissed for lack of good faith.

## BACKGROUND

*A.      The State Court Divorce Proceedings*

After approximately twenty-three years of marriage, the Debtor filed for divorce from the Creditor in 1998.[1]  (Trial Tr. at pp. 27-28.)  The divorce proceedings were extremely contentious and ultimately concluded some two years later pursuant to a Judgment of Divorce (the "Judgment of Divorce") issued by the Eaton County Circuit Court (the "State Court"). (Creditor's Ex. 16.)  In a section of the Judgment of Divorce entitled "Non-Modifiable Spousal Support," the State Court required that the Debtor pay the Creditor spousal support in monthly installments of $350 until the aggregate amount of $12,600 was paid.  (Creditor's Ex. 16 at p. 2.)

Importantly, the Judgment of Divorce was premised on the Creditor's ability to "resume her music teaching business" and required that "a smooth transition occur and that all properties delivered and/or received by each party are in <u>working condition</u>, and in the same condition that existed at the time of separation . . . in order for the parties to qualify for . . . holding the other harmless." (Creditor's Ex. 16 at p. 3 (emphasis in original).)  Although the Judgment of Divorce included a waiver by the Creditor of her right to seek modification of spousal support, it also provided an exception which permitted the Creditor to seek modification for "exigent circumstances," jurisdiction for which was expressly reserved by the State Court.  (Creditor's Ex. 16 at pp. 4, 24.)

The Judgment of Divorce divided the assets of the parties and identified an extensive list of specific items of personal and real property awarded to each party.  (Creditor's Ex. 16 at pp. 5-11.)  The Creditor was awarded, among other things, the following property:

> One hundred (100%) of all assets connected with [Creditor's] music business, including, but not limited to, the 1994 piano, the 1996 keyboard, all royalties (if any) to be received, any and all music created by the [Creditor]; 100% of all equipment, records, and assets, et cetera. [sic] associated with [Creditor's] music teaching (creation) business, including her students' awards, rewards, et cetera. <u>These assets shall not disappear and shall be retained or received in the same condition as existed in 1997 when the parties separated</u>.

(Creditor's Ex. 16 at p. 9 (emphasis in original).)

After entry of the Judgment of Divorce, the Debtor seemingly made timely payments of spousal support as required by the Judgment of Divorce.  (Trial Tr. at pp. 28-29.)  In fact, it appears that the Debtor completed his support obligation ahead of schedule.  (Trial Tr. at p. 28.) However, in April 2009, the Creditor filed a motion to enforce the Judgment of Divorce in the

---

[1]      The Debtor testified that he believed that he filed for divorce in 1997; however, a review of the State Court docket shows that the divorce was actually filed in February 1998.  (Creditor's Ex. 15.)

State Court.[2]  (Creditor's Ex. 15.)  In her motion, the Creditor alleged that she had not received from the Debtor certain property awarded to her, including her teaching materials, designs, manuscripts, a piano, and other items used in her work as a music teacher.  (Trial Tr. at pp. 145-46.)

The parties eventually stipulated in February 2010 to enter into "binding mediation" to resolve the issues of alimony, property settlement, and attorneys' fees and costs.[3]  (Creditor's Ex. 1 at p. 1.)  A Stipulation and Order for Binding Mediation (the "Mediation Stipulation"), which was approved and entered by the State Court, stated that the report and recommendation of the mediator "shall be in the form and nature of a binding mediation award which the parties agree shall be deemed accepted by each of the parties upon filing with the court without the signatures of the parties and without other formality and that such award shall be incorporated in the judgment entered in this case."  (Creditor's Ex. 1 at p. 2.)  The Mediation Stipulation further provided that the State Court would not modify or set aside the award unless the court could find corruption or fraud, misconduct by the mediator prejudicial to the parties' rights, or the mediator exceeded the authority granted to him by the State Court.  (Creditor's Ex. 1 at p. 2.)  Finally, the Mediation Stipulation contemplated entry of a judgment by the State Court based on the findings and rulings of the mediator.  (Creditor's Ex. 1 at p. 2.)

Like the initial divorce proceedings, the "mediation" process was extensive and contentious, taking roughly two years to complete and involving the testimony of approximately twenty to twenty-five witnesses.  (Trial Tr. at pp. 54, 124, 129, 150-51.)  At the conclusion of the mediation in November 2012, the mediator issued a twenty-two page Binding Mediation Award (the "Mediation Award") in which he made various findings as to the actions of the Debtor, the value of property awarded to the Creditor in the Judgment of Divorce that had not been returned, and the Creditor's need for additional spousal support.  (Creditor's Ex. 17.)

In the Mediation Award, the mediator noted that the Debtor had failed to return certain personal property awarded to the Creditor in the Judgment of Divorce, had caused damage to the marital home awarded to the Creditor, had granted a fraudulent mortgage to his son on a cottage awarded to the Debtor in order to shield the property from collection efforts by the Creditor, and had perjured himself in testimony before the State Court.[4] (Creditor's Ex. 17.)

---

[2]    When the Creditor filed her enforcement motion in State Court, the Debtor had been remarried for approximately four years to his current spouse and co-Debtor in this case, DCummings.  (Trial Tr. at p. 30.)  It is unclear why the Creditor waited ten years to file her motion.

[3]    Although the Debtor alleged at the trial that he was forced to participate in the mediation, he did acknowledge his signature on the stipulation to mediate.  (Trial Tr. at pp. 52-53; Creditor's Ex. 1.)

[4]    The court disagrees with the Debtors' contention at the evidentiary hearing that the mediator's factual findings must be wholly ignored due to a purported lack of authority of the mediator to fully adjudicate the dispute. The Mediation Stipulation expressly authorized the mediator to issue a report and recommendation that would be deemed accepted by the parties and incorporated into the State Court's judgment.  (Creditor's Ex. 1 at p. 2.)  As agreed by the parties, the Mediation Award was fully incorporated into the State Court's Support Order (as defined below).  (Creditor's Ex. 18 at ¶ 11.)  Moreover, although termed a "mediation," the process was, in effect, a binding arbitration.  "[B]oth federal and Michigan law give collateral estoppel effect to issues actually litigated in an arbitration proceeding between the same parties unless the procedures were unfair."  *Central Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 (6th Cir. 1991); *see also In re Inman*, 2012 WL 2374419, at *17 (Bankr. S.D.

In a section of the Mediation Award entitled "Property Values," the mediator found that the Creditor's allegations as to the unreturned property had been proven and that she was therefore entitled to a modified judgment in the amount of $97,252.38. (Creditor's Ex. 17 at pp. 16-17.)  The mediator further found that the actions of the Debtor and his son had deprived the Creditor of property (*i.e.*, the music materials) necessary for her to earn a living. (Creditor's Ex. 17 at pp. 19-21.)

In the section entitled "Spousal Support," the mediator found that after consideration of the parties' respective incomes, the Creditor's circumstances were "exigent." (Creditor's Ex. 17 at p. 21.)  The Mediation Award awarded the Creditor "the current spousal support" as well as "*additional spousal support* in the amount of $652 per month which shall continue until such time as the Judgment amount awarded herein has been fully paid with interest together with the attorney fees and costs awarded herein." (Creditor's Ex. 17 at pp. 21-22 (emphasis added).) Finally, the Mediation Award awarded attorneys' fees in the amount of $75,000. (Creditor's Ex. 17 at p. 22.)  The award of attorneys' fees to the Creditor was based on the Debtor's dilatory tactics as well as his denial that he had any of the Creditor's property, including the music materials, until the last day of testimony. (Creditor's Ex. 17 at p. 22.)  It is important to note that the award of attorneys' fees is also referenced in the section awarding spousal support, where the mediator emphasized that the creditor has "very little, if any, income" from other sources. (Creditor's Ex. 17 at pp. 21-22.)

After the Mediation Award was issued, the State Court entered a Uniform Spousal Support Order (the "Support Order") incorporating the judgment amount set forth in the Mediation Award. (Creditor's Ex. 18.)  The Support Order expressly states that (i) "spousal support" shall be paid by the Debtor to the Creditor in the amount of $1,394.50 per month, and (ii) "past-due amounts owed under any prior support order are preserved." (Creditor's Ex. 18.) The Support Order also contains the following additional provision:

> Plaintiff [the Debtor] shall pay the additional $652.50 per month in periodic spousal support (for total monthly spousal support payment of $1,394.50) until the amount awarded in the Binding Mediation Award ("BMA") (including costs and attorney fees awarded therein) has been paid in full, with interest, or until the death of the payee [the Creditor].  All previously ordered spousal support shall continue until the death of the payee [the Creditor].  This Order does not otherwise limit or affect [the Debtor's] rights under the BMA.

(Creditor's Ex. 18.)[5]

---

Fla. June 22, 2012) (debtor's "prior experience in divorce, and the fact that he was represented by counsel through negotiation and documentation of the Mediation Agreement, lead the Court to give particular weight to the language in the Mediation Agreement itself").

[5]     No testimony was given regarding the support previously awarded and already in existence at the time the Mediation Award was rendered and the Support Order was issued.  Similarly, the parties did not direct the court's attention to any such information in the documents admitted into evidence.  While the docket from the State Court includes several shorthand references to requests for support, it is unclear which requests were granted and what was

After entry of the Support Order, the Debtor continued to file various motions in the State Court challenging the Mediation Award. (Creditor's Ex. 15.) The Creditor eventually sought and obtained a writ of garnishment to enforce the Support Order in early 2014, which was opposed by the Debtor in the State Court. (Creditor's Ex. 15.)

B.      *The Bankruptcy Filing, the Plan, and the Objections*

Precipitated by the Creditor's garnishment of their bank accounts, the Debtors filed a joint petition for relief under Chapter 13 [Dkt. No. 1] with this court on March 7, 2014 (the "Petition Date"). (Trial Tr. at pp. 49, 101.) Five days later, the Debtors filed their initial Plan, which proposed payments of $1,480 per month and a dividend to unsecured creditors of $1,000. As to the Creditor's claim, the Plan provided that the Debtor would pay the on-going domestic support obligation directly from his Social Security and pension. The Debtors' Schedules identified the Creditor's claim as a property settlement and classified it as a general unsecured claim in the amount of $170,000 on Schedule F [Dkt. No. 4]. The Creditor was also identified on Schedule E, which states the Creditor is entitled to alimony in the amount of $0 with a notation that the Debtor was current on payments as of the Petition Date.

The Debtors' initial Plan proposed to surrender the cottage awarded to the Debtor in the Judgment of Divorce. The original Plan also provided for the retention of two vehicles, a 2008 Chevrolet Silverado and a 2011 Buick Lacrosse, subject to the liens of secured creditors. The Debtors subsequently amended their Plan several times to eventually surrender the Chevrolet, decrease the plan payment to $1,146 per month, include a payment of $300 per month for pre-petition domestic support arrearage of $10,240 owing to the Creditor, and increase the base amount paid to unsecured creditors to $5,000. In their most recent amendment to the Plan, the Debtors propose to pay $300 per month to the Creditor for prepetition arrears and an additional $1,394.50 per month for ongoing post-petition domestic support obligations. The ongoing post-petition domestic support obligation of $1,394.50 per month in the Plan is the same amount the Debtor is required to pay to the Creditor under the Support Order. (Creditor's Ex. 18.)

The Creditor filed her Plan Objection on April 23, 2014. In it she alleges that the Plan does not comply with section 1325(a)(8) because the Plan fails to provide for full payment of the domestic support owing to the Creditor, and the Plan would not be feasible under section 1325(a)(6) if it were amended to provide for full payment. The Plan Objection further alleges that the Plan was not proposed in good faith under section 1325(a)(3) because the Debtors' case was filed only after the Creditor took action in the State Court to enforce her rights under the Support Order. The Plan Objection also contends that the Debtors' actions in filing their case were not in good faith under section 1325(a)(7) due to the Debtors' granting of a fraudulent mortgage on the cottage and incursion of new secured debt for two vehicles in anticipation of the bankruptcy. Finally, the Plan Objection asserts that the Debtors' Schedules do not accurately set forth the Debtors' assets, liabilities, and financial history.

---

actually ordered by the State Court prior to the Mediation Award and the Support Order. (*See* Creditor's Ex. 15 at p. 9.)

Seemingly in response to the Creditor's actions, the Debtors filed their Claim Objection to the proof of claim of the Creditor, alleging, among other things, that the obligations owed to the Creditor were not domestic support obligations, but rather in the nature of a property settlement.   The Debtors further assert that because the Creditor is still in possession of a garnishment paid pursuant to a writ of garnishment issued by the State Court, the Creditor's claim must be disallowed pursuant to section 502(d).

Finally, the Creditor filed her Motion to Dismiss, which alleges, without much detail, that (i) the Debtor's conduct in the divorce proceedings is indicative of bad faith, (ii) the Debtors' Schedules filed in the bankruptcy are misleading, (iii) the Debtors conspired to fraudulently encumber their cottage with an improper mortgage, (iv) the Debtors' plan does not devote sufficient payment to general unsecured creditors based on the Debtors' disposable income, and (v) the Debtors violated orders of the State Court by purchasing new vehicles in order to reduce their monthly income.

In a response brief, the Debtors suggest that the Creditor's arguments are premature and misplaced.   According to the Debtors, the alleged conduct giving rise to the Creditor's Motion to Dismiss is more appropriately considered in connection with confirmation of the Debtor's Plan. The Debtors later supplemented these arguments in a separate brief [Dkt. No. 78].

On July 8, 2014, the Debtors filed a motion for summary judgment [Dkt. No. 49] seeking a declaration that the amount owing under the Mediation Award is not a domestic support obligation as defined by section 101(14A).   This court ultimately denied summary judgment [Dkt. No. 80] as it found genuine issues of material fact and sought testimony.

On July 23, 2014, the court conducted a preliminary hearing regarding the various pending objections and motions.   The court decided to schedule this matter for a consolidated evidentiary hearing [Dkt. No. 59].

*C.     The Evidentiary Hearing*

The court conducted its consolidated evidentiary hearing on October 21, 2014.   The Debtors and the Creditor both submitted briefs [Dkt. Nos. 78, 81] in advance.   At the day-long hearing, the court heard testimony from the Debtors, the Creditor, and Mark Haslem, who was (and still may be) legal counsel to the Creditor in the divorce proceedings.[6]   The court admitted into evidence twenty-three exhibits, which included documents from the divorce proceedings, responses to discovery requests, several filings in the bankruptcy case, a budget compiled by the Debtors, a mortgage on the cottage in favor of the Debtors' son, and the Debtors' bank statement.

In his testimony, the Debtor generally denied the wrongdoing discussed in the Mediation Award and asserted that the mediator was biased.  (Trial Tr. at p. 58-60; 62-63.)   As to the mortgage granted to Bryan Cummings (his son), the Debtor testified that his son was a contractor

---

[6]     At the hearing, the Creditor called Melinda Simon, the Creditor's psychologist, to testify.   The Debtors objected pursuant to an oral motion *in limine*.   For the reasons stated on the record at the hearing, the court granted the Debtors' motion and barred the testimony of Ms. Simon.

who had made some improvements to the cottage and was granted a mortgage in the amount of $110,000 to ensure payment for that work.[7] (Trial Tr. at p. 34.) The Debtor testified that his only income is from Social Security, a pension, and worker's compensation and that he has various health issues which prevent him from working. (Trial Tr. at p. 36-37.) The Debtor also provided testimony as to the Debtors' expenses that, to some extent, corroborated the information contained in their Schedule J. (Trial Tr. at p. 40-42; Creditor's Ex. 10.) The Debtor further testified that prior to the filing of the bankruptcy, the Debtors' two vehicles were in disrepair, which required the Debtors to obtain two replacement vehicles. (Trial Tr. at pp. 47-49.) Although the Plan originally proposed to retain both vehicles, the Debtor testified that the Debtors now intend to retain only one vehicle. (Trial Tr. at p. 51.) Lastly, the Debtor disclosed that shortly before the Petition Date, he paid his divorce attorney $5,000 to continue the divorce proceedings post-petition. (Trial Tr. at p. 67.)

The co-Debtor, DCummings, testified that at the time of the bankruptcy filing, the Debtors had been current on all obligations, including their credit card bills and mortgage payments on the cottage. (Trial Tr. at pp. 102, 116.) She explained that the Debtors filed bankruptcy because of the Creditor's garnishment.[8] (Trial Tr. at p. 101.) DCummings further noted that her income is derived from Social Security and that she suffers from extensive health problems that make it difficult for her to work. (Trial Tr. at pp. 91-92.)

Mr. Haslem, the Creditor's attorney, testified regarding the mediation process, the Debtor's alleged misconduct during the mediation, and the allegations of bias against the mediator who issued the Mediation Award. (Trial Tr. at pp. 124-30.) As the court noted at the hearing, because Mr. Haslem represented (and may still represent) the Creditor in the divorce proceedings, the court treats the testimony of Mr. Haslem with limited weight given his bias.[9] (Trial Tr. at p. 127-28.)

The Creditor testified that she currently receives $1,390 per month in spousal support from the Debtor, which was the amount proposed to be paid to her in the Plan. (Trial Tr. at p. 141.) She further testified that her only other source of income is from Social Security disability. (Trial Tr. at p. 142.) The Creditor stated that she suffers from post-traumatic stress disorder (allegedly caused by the Debtor) that makes it difficult for her to leave her home, and that the Debtor's refusal to return property awarded to her in the Judgment of Divorce prevented her from garnering an income. (Trial Tr. at pp. 143, 145-150, 156.) She also stated that she is continuing to incur legal expenses due to the Debtor's ongoing challenge of the support award in the State Court. (Trial Tr. at p. 155.) During the evidentiary hearing in this matter, the court was advised that the Debtor was in the process of appealing the Mediation Award and the Support Order to modify the spousal support. (Trial Tr. at p. 67.)

---

[7]    According to Schedule A, the value of the cottage is only $80,000. (Creditor's Ex. 2.)

[8]    Counsel for the Creditor and the Debtors advised the court at the hearing that the funds garnished by the Creditor from the Debtors' account had been provided on the morning of the hearing to the Debtors' counsel in the form a trust account check. (Trial Tr. at pp. 103-104.)

[9]    The testimony of Mr. Haslem was also, for the most part, not relevant.

In closing arguments, the Debtors' counsel acknowledged that it would be impossible for the Debtors to propose a plan that provides for payment of the entire amount should the court conclude that the Mediation Award and the Support Order impose a domestic support obligation. (Trial Tr. at p. 167.)  After the evidentiary hearing, the court took the matter under advisement.

### DISCUSSION

As noted above, the Debtors and the Creditor have filed numerous motions, responses and objections.  The outcome in this case depends on whether certain obligations of the Debtors in the Mediation Award and Support Order can be characterized as "domestic support obligations," and whether the Debtors have filed their case in good faith.

*A.      Confirmation of the Plan*

In her Plan Objection, the Creditor contends that (i) the Plan fails to provide for payment in full of her claim, (ii) the Debtor has failed to make all payments required under the Mediation Award and the Support Order, (iii) the Plan is not feasible, and (iv) the Plan was not proposed in good faith.  For the reasons set forth below, the court concludes that the Plan is not confirmable because it fails to classify the Creditor's entire claim as a domestic support obligation.[10]

*1.      Legal Standard*

Section 1322(a) provides in relevant part that the plan:

> shall provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507 of this title, unless the holder of a particular claim agrees to a different treatment of such claim. . .

11 U.S.C. § 1322(a)(2).  The Bankruptcy Code grants claims for "domestic support obligations" priority status under section 507.  These claims must be paid in full under a Chapter 13 plan.  11 U.S.C. §§ 101(14A), 507(a)(1)(A), 1322(a)(2).

A domestic support obligation is defined as:

> a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is –
>
> (A)      owed to or recoverable by –
>
>> (i)      a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or

---

[10]      The Creditor's objections under section 1325(a)(3) and (7) shall be discussed below, albeit briefly and indirectly, in connection with the court's consideration of the Motion to Dismiss. *See infra* at p. 21 n.24.  The court need not address the Creditor's objection under section 1325(a)(8).

(ii)     a governmental unit;

(B)     in the nature of alimony, maintenance, or support (including assistance provided by a governmental unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;

(C)     established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of –

(i)     a separation agreement, divorce decree, or property settlement agreement;

(ii)     an order of a court of record; or

(iii)     a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

(D)     not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A).[11]

Whether an obligation is in the nature of support in bankruptcy is a federal question. *In re Larson-Asplund*, --- B.R. --- , 2014 WL 5017833, at *5 (Bankr. E.D. Mich. Oct. 8, 2014) (citing *Long v. Calhoun (In re Calhoun)*, 715 F.2d 1103, 1107 (6th Cir. 1983)). When determining whether a debt is in the nature of support under section 101(14A), courts consider the factors set forth in decisions prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *See, e.g.*, *In re Boller*, 393 B.R. 569, 574 (Bankr. E.D. Tenn. 2008). Although the debtor, as the plan proponent in a Chapter 13 case, has the burden of proposing a plan that satisfies the standards of confirmation, the non-debtor party has the burden of proving by a preponderance of the evidence that the debt is a domestic support obligation. *Fitzgerald v. Fitzgerald (In re Fitzgerald)*, 9 F.3d 517, 520 (6th Cir. 1993).

---

[11]     In this case, it is clear, and the parties seem to agree, that other than the nature of the debt, all elements under section 101(14A) are present [Dkt. Nos. 50, 54-1]. The debt arising from the Mediation Award accrued approximately two years prior to the Petition Date. The debt is owed to the Debtor's former spouse and has not been assigned to a nongovernmental entity. *See* 11 U.S.C. § 101(14A)(A) and (D). To the extent that the Debtors contend that the Mediation Award does not constitute an order of the State Court in connection with the parties' divorce, the court disagrees. As noted previously, the Mediation Award was incorporated into the Support Order, which is clearly "an order of a court of record." *See supra* at p. 3 n.4; 11 U.S.C. § 101(14A)(C).

The Sixth Circuit Court of Appeals has instructed courts to review the following factors to determine if an obligation, including an award of attorneys' fees, is in the nature of support:

> (i)   a label such as alimony, support or maintenance in the decree or agreement;
>
> (ii)   a direct payment to the former spouse, as opposed to the assumption of a third party debt; and
>
> (iii)   payments that are contingent upon events such as death, remarriage, or eligibility for social security benefits.

*Sorah v. Sorah (In re Sorah)*, 163 F.3d 397, 401 (6th Cir. 1998); *see Rugiero v. DiNardo (In re Rugiero)*, 502 Fed. Appx. 436 (6th Cir. 2012) (applying *Sorah* factors to conclude award of attorneys' fees constitutes domestic support obligation).[12]

"An award that is designated as support by the state court and that has the above indicia of a support obligation (along with any others that the state support statute considers) should be conclusively presumed to be a support obligation by the bankruptcy court." *In re Sorah*, 163 F.3d at 401.[13]

Once the non-debtor spouse has established that the obligation has all the indicia of support, the debtor may not introduce evidence to the contrary. *Id*. at 401-402. As instructed by the Sixth Circuit, the bankruptcy court may not second guess the state court, even when the bankruptcy court believes that the state court award was punitive in nature. *Id*. at 402. A state court's award of alimony and support is entitled to deference when labeled and structured as such. *Id*. This deference is not based on the principle of res judicata; rather a bankruptcy court should only look to the structure of an obligation to determine if it is in the nature of support. *Id*. at 403.

A non-debtor spouse who demonstrates that the *Sorah* factors are present has satisfied his or her burden of proving that the obligation constitutes support and is thus non-dischargeable. *Id*. at 401 (citing *In re Calhoun*, 715 F.2d 1103, 1111 (6th Cir. 1983)). The burden then shifts to the debtor to demonstrate that although the obligation is of the type that may not be discharged as support, the amount is unreasonable in light of the debtor's financial circumstances. *Id*.

---

[12]   "Historically, the award of attorney fees in a divorce judgment has been found to be in the nature of support in bankruptcy proceedings." *Mickler v. Mickler (In re Mickler)*, 324 B.R. 305, 316 (Bankr. W.D. Ky. 2005) (citations omitted).

[13]   Absent this conclusive presumption, courts consider other factors such as (i) the disparity of earning power between the parties, (ii) the need for economic support and stability, (iii) the presence of minor children, and (iv) marital fault. *Bailey v. Bailey (In re Bailey)*, 254 B.R. 901, 906 (B.A.P. 6th Cir. 2000) (citations omitted); *see Andrus v. Ajemian (In re Andrus)*, 338 B.R. 746, 754 (Bankr. E.D. Mich. 2006).

### 2.      *Spousal Support Award*

In the instant case, this court is required to apply the factors identified by the Sixth Circuit in *Sorah* to determine if the judgment in the Mediation Award and the Support Order equate to a domestic support obligation.  Based on an application of the *Sorah* factors, the court concludes that the Creditor has satisfied her burden by a preponderance of the evidence.

### a.      *Label of Alimony or Support*

Upon review of the Mediation Award and the Support Order, the judgment of $97,252.38 in favor of the Creditor was labeled "spousal support."  (Creditor's Ex. 17 at p. 21.)  The Debtors argue that the amount awarded for spousal support is, in reality, duplicative of the amount awarded in connection with the property settlement provisions, and thus more appropriately treated as a property settlement.  While it is true that the judgment amount was derived, in part, from the property claims of the Creditor, the Mediation Award and the Support Order, when read together, clearly evince an intention to deem the obligation as support.

First, the Mediation Award not only contained a heading entitled "Spousal Support," but it also provided the reasons for awarding spousal support to the Creditor (*i.e.*, denial of the music materials necessary for the Creditor to earn a living and support herself).  (Creditor's Ex. 17 at p. 21.)

Second, the Debtors cannot escape the express terms of the Support Order entered by the State Court.  The Support Order refers to the obligation as one of support on numerous occasions.  In addition, the Support Order includes a special provision at paragraph 11 that clarifies a total monthly spousal support payment of $1,394.50. (Creditor's Ex. 18 at p. 2.)  More importantly, even if some uncertainty or ambiguity could be read into the Mediation Award as the Debtors contend, the Support Order entered by the State Court expressly states that the obligation is not in the nature of a property settlement.  Specifically, paragraph 10 of the Support Order, which is labeled "Property Settlement," provides that "[a]ll property settlement (alimony in gross) payment obligations that are set forth in the judgment are not part of this order." (Creditor's Ex. 18 at p. 2.)  It is therefore clear that the Support Order itself distinguishes between the support obligation owed by the Debtor to the Creditor and any property settlement that might have otherwise arisen.

The Debtor also contends that the Mediation Award improperly attempts to modify the Judgment of Divorce.  The Debtors are incorrect. The Mediation Award actually supplements the Judgment of Divorce. The Mediation Award carefully states that the Creditor's circumstances are "exigent" and that the Creditor "is in need of the current spousal support *and* is entitled to *additional* spousal support" in the amount of $652 per month which shall continue until the time as the entire amount (including attorneys' fees) is paid in full.  (Creditor's Ex. 17 at pp. 21-22 (emphasis added).)  As set forth in the Judgment of Divorce, although the Creditor generally waived her right to seek modification of the support provisions, an exception exists where the circumstances are deemed exigent. (Creditor's Ex. 16 at pp. 4, 24.)  As such, the Mediation Award is consistent with the Judgment of Divorce.

Third, even if this court were to believe that the judgment amount was nothing more than a disguised property settlement designed to punish the Debtor (as the Debtors seemed to infer in their briefs and at trial), this court is without the authority to revisit the issue.  *See Sorah*, 163 F.3d at 402.  Instead, the court must defer to the decision of the State Court.  Therefore, based on the express terms of the Mediation Award and the Support Order, the court finds that the Creditor has satisfied the first factor under *Sorah*.

### b.      Direct Payment to the Former Spouse

The court must next consider whether the payments to be made by the Debtor to the Creditor are required to be made directly, or whether they are essentially indirect payments pursuant to the assumption of a third-party debt.  If the payment is to be made directly, such fact is indicative of a domestic support obligation under *Sorah*.  The court finds this factor is easily satisfied, and the Debtors conceded this point at the trial. (Trial Tr. at p. 168.)  The Mediation Award contemplates payment by the Debtor directly to the Creditor "until such time as the Judgment amount awarded herein has been fully paid with interest together with the attorney fees and costs awarded herein." (Creditor's Ex. 17 at p. 22.)   At no point does the Mediation Award find that the judgment amount relates to obligations owed to a third party.  In addition, the Support Order not only identifies the Debtor as the payor and the Creditor as the payee, but it also requires the Debtor to make monthly payments directly to the Creditor. (Creditor's Ex. 18 at p. 2.)  As such, the second factor under *Sorah* is satisfied.

### c.      Contingency of Payments

Finally, the court must consider whether the payments are contingent upon certain events such as death, remarriage or eligibility for social security benefits.  Without much basis for their position, the Debtors suggest that the judgment amount in the Mediation Award and the Support Order are not contingent.  The court disagrees, and finds that the payments required under the Mediation Award and especially the Support Order are clearly contingent upon future events.  In the Mediation Award, the Creditor was awarded additional support in the amount of $652 per month "until such time as the Judgment amount awarded herein [$97,252.38] has been paid in full. . ." (Creditor's Ex. 17 at p. 22.) The Support Order further provides that the monthly payments are to continue until the amount awarded in the Mediation Award "has been paid in full, with interest, *or until the death of the payee*." (Creditor's Ex. 18 at p. 2 (emphasis added).)

In sum, the court finds that all indicia under *Sorah* are present in this case, thereby leading to the conclusive presumption that the judgment of $97,252.38 constitutes a domestic support obligation under section 101(14A) of the Bankruptcy Code.  Because the obligation has all of the indicia of support, the court declines to, and cannot for that matter, consider any evidence to the contrary.[14]

---

[14]      Because the *Sorah* factors were conclusive in light of the evidence presented at the hearing, the court need not consider additional factors such as those cited in *Bailey*.  254 B.R. at 906.  However, even if the court considered additional factors, the court's decision would not change.  The Mediation Award found that (i) the Creditor suffered from diminished earning power due to the Debtor's refusal to return the music materials, (ii) the Creditor required additional economic support and stability, and (iii) the Debtor was the party at fault. (Creditor's Ex. 17 at pp. 19, 21-22.)

### d.      Reasonableness of Support Obligation

In *Sorah*, the Sixth Circuit also held that a debtor may demonstrate that the amount is unreasonable in light of the debtor's circumstances.  The court finds a decision from the Bankruptcy Court in the Eastern District of Kentucky instructive for purposes of determining whether the amount of the judgment (and the amount of attorneys' fees, as discussed below) is reasonable.  *See In re Mickler*, 324 B.R. at 316.  In *Mickler*, the court relied on the state court's ruling as well as other evidence at trial to determine whether the support obligation was reasonable after the *Sorah* factors had been satisfied.  The court noted, among other things, that "sufficient evidence was presented that any shortcomings on the part of [the debtor] to repay these debts result from a conscious choice by [the debtor] to be without funds" because the debtor voluntarily chose to use his resources for himself or unnecessarily on others.  *Id.*

The situation before this court is no different.  In the roughly two years prior to the Petition Date, the Debtors, instead of attempting to satisfy their obligations under the Mediation Award and the Support Order, elected to continue to make payments of close to $600 per month on the mortgage for their cottage, plus the additional expenses related to the cottage as detailed below.  (Creditor's Ex. 13 at p. 2.)  More troublesome is the fact that the Debtors decided that their interests would best be served by paying their divorce attorneys at least $22,600 to dispute the claims of the Creditor, despite the fact that the Debtor had admitted that he denied the Creditor with access to the property necessary for the Creditor to support herself.  (Creditor's Ex. 13 at p. 2.)  Inexplicably, the Debtors foolishly accumulated additional debt when they paid their divorce attorneys by credit card for at least two years.  (Creditor's Ex. 20.)  Finally, the Debtors irresponsibly purchased not one, but two new automobiles prior to the Petition Date.  (Trial Tr. at pp. 47-49.)  Although the Debtors credibly testified that their vehicles were in disrepair, the Debtors offered no explanation as to why they could not share one vehicle, keeping in mind that they are both retired.

In addition, the Debtors did not introduce any evidence, whether in the form of documents or testimony, regarding their financial situation beyond Schedules I and J.  Instead the Debtors only generically testified that their financial condition renders the judgment unreasonable.  The court was not presented with even a range that the Debtors believe to be reasonable given their circumstances.  In fact, the Debtors' own Plan seems to support the reasonable nature of the support award, as it proposes to pay the exact amount required by the Support Order as a domestic support obligation.  The court declines to arbitrarily determine reasonableness, as the Debtors carry this burden.  The court therefore concludes that the amount of spousal support set forth in the Mediation Award and the Support Order is reasonable.

In any event, the Debtors cannot honestly claim that their financial situation merits a reduction of the support awarded to the Creditor.  The Debtors' deteriorated financial condition is a direct result of the Debtor's desire to deny his former spouse the support to which she is entitled.  This is not a situation resulting from mistake or misfortune.  *See Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).  Rather, the Debtors' hardship has been self-inflicted.  It is directly related to the Debtor's decision to deny the Creditor a means by which to live and his inability to face the consequences of his misconduct.

### 3. Attorneys' Fees

Having concluded that the judgment of $97,252.38 established in the Mediation Award and ratified by the Support Order constitutes a domestic support obligation, the court must next consider whether the award of attorneys' fees in the amount of $75,000 is entitled to the same status. *See In re Rugiero*, 502 Fed. Appx. at 438-40. The court concludes that it is.

### a. Label of Alimony or Support

Upon review of the Mediation Award and the Support Order, the court finds that the attorneys' fees awarded to the Creditor were labeled as support. The Mediation Award states under the heading "Spousal Support" that the judgment shall continue until it has "been fully paid with interest *together with the attorney fees and costs awarded herein*." (Creditor's Ex. 17 at p. 22 (emphasis added).) In addition, the mediator expressly found that the duration of the State Court litigation and mediation was the direct result of the Debtor denying that he possessed the Creditor's property (*i.e.*, the music materials) necessary for her to earn a living, and "his causing [the Creditor's] attorney to spend considerable time and effort needlessly. . ." (Creditor's Ex. 17 at p. 22.) For these reasons, the mediator found attorneys' fees not only appropriate, but directly related to the award of additional spousal support.

The Support Order also supports a conclusion that the attorneys' fees were intended to be support. In the Support Order, the State Court expressly stated that the amount awarded in the Mediation Award "(including costs and attorney fees awarded therein)" shall continue until such amount has been paid in full or until the death of the Creditor. (Creditor's Ex. 18 at p. 2.) Therefore, according to the State Court, the attorneys' fees are incorporated into the support judgment.

This court's conclusion is consistent with that of the Sixth Circuit in *Rugiero*, where the court explained:

> Were it otherwise, a litigious boyfriend, to use one example that comes to mind, could make life miserable for his girlfriend by waging a costly custody dispute over their children, one that the girlfriend might not be able to fend off based on her earnings (and other child-support payments) alone. That is why many courts have treated fee awards as "support" payments; it is the only way to allow some parents to vindicate their rights in court.

*Id*. at 439 (citations omitted).

Similar to the observations of the Sixth Circuit in *Rugiero*, the Debtor seemingly made life miserable for the Creditor by continuing to withhold the Creditor's property that precluded her from earning a living. The Mediation Award is painstakingly clear that the Debtor was vindictive, spiteful and dilatory toward the Creditor, thus causing the Creditor to incur significant legal fees in order to obtain the spousal support. (Creditor's Ex. 17 at pp. 21-22.) The Mediation

Award also sufficiently states that the Creditor has little, if any, income from sources other than Social Security, her portion of the Debtor's retirement, and the current spousal support order. (Creditor's Ex. 17 at p. 21.)   Like in *Rugiero*, the Debtor continued to wage costly litigation to his own detriment not only in the divorce proceedings, but, ultimately, in this bankruptcy case.

### b.       Direct Payment to the Former Spouse

With respect to the second *Sorah* factor, the Mediation Award and the Support Order both required that the Debtor directly pay the attorneys' fees to the Creditor.  (Creditor's Ex. 17 at p. 22; Creditor's Ex. 18 at p 2.)  The second factor is thus satisfied without the need to discuss it further.

### c.       Contingency of Payments

Finally, like the judgment amount discussed above, the Mediation Award and the Support Order provide that the payment of attorneys' fees is to continue until they are paid in full or the death of the Creditor.  The court finds that the payment of the attorneys' fees is contingent, thus satisfying the third *Sorah* factor.

In sum, the court finds that all indicia under *Sorah* are present with respect to the Creditor's attorneys' fees, and therefore concludes that the attorneys' fees constitute a domestic support obligation under section 101(14A).

### d.       Reasonableness of Attorneys' Fees

As noted above, the Debtors may nonetheless demonstrate that the amount of the attorneys' fees is unreasonable in light of the Debtors' circumstances.  For the reasons previously stated, the court finds that the Debtors have not satisfied their burden of demonstrating that the attorneys' fees are unreasonable.

Based on the foregoing, the entire amount of the Creditor's claim constitutes a domestic support obligation.  The Debtors' Plan therefore fails to satisfy section 1322(a)(2) and is not confirmable.

## B.       Objection to Creditor's Claim

In their one-page objection to the Proof of Claim, the Debtors contend (i) that the Creditor's claim should be characterized as a property settlement, not a domestic support obligation entitled to priority, (ii) that the proof of claim is deficient because it did not include a writing as required by Rule 3001(c)(1) of the Federal Rules of Bankruptcy Procedure, and (iii) the Creditor's claim is subject to disallowance under section 502(d) of the Bankruptcy Code. The Creditor, in her one page response, contends that the obligation is a domestic support obligation, that the proof of claim can be amended if deficient, and that the garnished funds shall be returned if required by court order.

When a creditor properly executes and files a proof of claim in accordance with the Federal Rules of Bankruptcy Procedure, the proof of claim constitutes *prima facie* evidence of the validity and amount of the claim. *In re Hughes*, 313 B.R. 205, 208 (Bankr. E.D. Mich. 2004) (citations omitted). If a party objects to the claim, the objecting party has the burden of presenting evidence to overcome the *prima facie* validity and amount of the claim. *Id.* (citations omitted). "If the objecting party produces evidence to refute at least one of the allegations essential to the claim's legal sufficiency, the burden of persuasion shifts back to the claimant." *Id.* (citations omitted). As such, the claimant must ultimately prove by a preponderance of the evidence that the claim is valid. *Id.* at 208-09 (citations omitted).

In this case, because the court has already determined that the judgment award and the attorneys' fees are both domestic support obligations, the Creditor has satisfied her burden and the court thus overrules the Debtors' first objection.

With respect to the second argument, the Creditor amended her proof of claim on July 23, 2014 to attach a copy of the Support Order. Even if an argument could be made that the amendment fails to cure the alleged defect, the court finds that the Creditor has sufficiently placed the Debtor on notice of her claim by virtue of the pleadings filed in this case before the expiration of the claims bar date. *See Barlow v. M.J. Waterman & Assocs., Inc. (In re M.J. Waterman & Assocs., Inc.)*, 227 F.3d 604, 609 (6th Cir. 2000); *see also* Kurt A. Steinke, Protective and Informal Proofs of Claim, Detroit Consumer Bankruptcy Conference, American Bankruptcy Institute (Nov. 11, 2014). The court therefore rejects the Debtors' second argument.

Lastly, the court need not determine whether the claim should be disallowed under section 502(d) because the Creditor tendered payment of the garnished funds prior to the commencement of the trial, effectively rendering this objection moot.[15] *See In re Sterba*, 383 B.R. 47, 51 (B.A.P. 6th Cir. 2008) (federal courts have "no authority to render a decision upon moot questions or to declare rules of law that cannot affect the matter at issue") (citing *Church of Scientology v. United States*, 506 U.S. 9 (1992); *NAACP v. City of Parma*, 263 F.3d 513 (6th Cir. 2001)).

In sum, the Creditor has successfully satisfied her burden after it shifted upon the filing of the Debtors' Objection. The Debtors' Objection is therefore overruled.

C.     *The Motion to Dismiss*

In addition to the Plan Objection, the Creditor filed a Motion to Dismiss alleging that the Debtors' petition was not filed in good faith. As examples of the Debtors' alleged lack of good faith, the Creditor contends in her two page motion that the Debtors were current on their bills, including payments on the mortgage related to their cottage, and that the sole purpose of the bankruptcy filing was to avoid payment to the Creditor. (Motion to Dismiss at p. 1.) The

---

[15]     The court is not convinced that an otherwise validly filed proof of claim should be deemed disallowed pursuant to section 502(d) absent a prior adjudication of the alleged liability giving rise to the objection. *See In re Southern Air Transp., Inc.*, 294 B.R. 293, 296-97 (Bankr. S.D. Ohio 2003). However, the court need not decide the issue in the context of this case.

Creditor further alleges that the Debtors' schedules are false and misleading and that the Debtors obtained new vehicles shortly before the bankruptcy filing with the intent of reducing their disposable income. (Motion to Dismiss at p. 2.) The Creditor also emphasizes the minimal thirty-six month duration of the Debtors' proposed Plan, as well as the minimal proposed dividend of $1,000 to unsecured creditors.[16] (Motion to Dismiss at p. 2.)

Section 1307(c) provides that a debtor's bankruptcy case should be dismissed for cause, including but not limited to certain examples. *See* 11 U.S.C. § 1307(c)(1)-(11). A party requesting dismissal has the burden of proof under section 1307(c). *Alt v. United States (In re Alt)*, 305 F.3d 413, 420 (6th Cir. 2002). A court should be more reluctant to dismiss a case under section 1307(c) for lack of good faith than to reject a plan for lack of good faith under section 1325(a). *Id*. (citing *In re Love*, 957 F.2d 1350, 1356 (7th Cir. 1992)).

When considering whether cause exists to dismiss a case, the Sixth Circuit has instructed courts to consider the non-exhaustive list of factors used to determine if a plan has been proposed in good faith. *Id*. at 419 (citing *Society Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 591 (6th Cir. 1992) (totality of circumstances)). Good faith is a flexible and non-specific determination. *In re Alt*, 305 F.3d at 419 (citation omitted). "Ultimately, 'the decision should be left simply to the bankruptcy court's common sense and judgment.'" *In re Larson-Asplund*, --- B.R. ---, 2014 WL 5017833, at *8 (Bankr. E.D. Mich. 2014) (citing *Metro Employees Credit Union v. Okoreeh-Baah (In re Okoreeh-Baah)*, 836 F.2d 1030, 1033 (6th Cir. 1988)).

Upon consideration of the totality of the circumstances, the court concludes that the Creditor has satisfied her burden under section 1307(c). While some of the *Alt* factors are inapplicable to the present case, the following factors are relevant: (i) the debtor's income, (ii) the debtor's living expenses, (iii) the debtor's attorney's fees, (iv) the expected duration of the plan, (v) the sincerity with which the debtor has petitioned for relief, (vi) the debtor's potential for future earning, (vii) special circumstances, such as high medical costs, (viii) the circumstances under which the debt was incurred, and (ix) the amount of payment offered by the debtor as indicative of the debtor's sincerity, and (x) the statutorily mandated policy that bankruptcy provisions be construed liberally in favor of the debtor. *See In re Alt*, 305 F.3d at 419.

In the instant case, both Debtors credibly testified that they are retired and have no income other than their pensions and other retirement benefits. (Trial Tr. at pp. 36-37, 92.) The Debtors also testified that they have made efforts to curtail their expenses, and the Debtors are not "bowlers," do not belong to any "country club," and do not take vacations. (Trial Tr. at pp. 44-45, 94-95.) The court therefore finds that the majority of the Debtors' living expenses are reasonable. However, the court does not share this view with respect to certain expenses, as detailed below.

The Debtors also both credibly testified that they suffer from medical conditions. (Trial Tr. at pp. 42-43, 97.) It is not clear to the court that these medical conditions would prevent the Debtors from working. However, the Creditor did not present any evidence to the contrary.

---

[16] After the Motion to Dismiss was filed, the Debtors amended their Plan to increase the dividend to unsecured creditors from $1,000 to $5,000. [Dkt. No. 77]

While the Plan proposes an applicable commitment period of thirty-six months, the duration of the payments may actually be longer as contemplated by the Plan itself.  No evidence was introduced as to the length of time that the plan is in fact projected to run.  As such, the court cannot conclude based on the record that the duration of the plan is in any way devious.  However, the court shares the concern expressed by the Creditor.  If the Debtors truly filed Chapter 13 in good faith, the Debtors might have considered continuing their Plan for sixty months in order to pay the greatest dividend possible to their creditors, including the Creditor.  This issue, by itself is not dispositive, however.

As the Creditor noted in her Motion to Dismiss and at the hearing, the Debtors' schedules are inaccurate.  The Creditor elicited testimony from DCummings that she owned diamond and emerald and diamond and sapphire dinner rings, at least one of which she received from her grandmother that had not been listed on the Debtors' Schedules.[17]  (Trial Tr. at p. 110-11; Creditor's Ex. 3, 4.)  The court is concerned that the Debtors failed to list an asset with apparent sentimental and possibly monetary value when the Debtors were careful to list their family pictures, valued at $20.00, on their Schedules.  (Creditor's Ex. 3.)  This omission by itself is not determinative though, as debtors frequently inadvertently fail to list certain items of personal property.  Less forgiving and as discussed below is the fact that the Debtors' Schedules also failed to include any mention of an outstanding balance, or continuing payments on Schedule J, to the Debtor's divorce attorney for pursuit of an appeal or modification of the Mediation Award and the Support Order.  (Trial Tr. at p. 71; Creditors Ex. 8, 10.)

With respect to the Debtors' sincerity in petitioning for relief and the amount of payments, the Debtors both testified that they cannot afford to satisfy their obligations to their creditors given their current financial situation.  While no one, not even the Creditor, disputes that the Debtors cannot satisfy their obligations to all creditors, the court finds no sincerity in connection with the Debtors' petition.  Likewise, for the reasons discussed below, the court finds that the circumstances under which the debt was incurred counsels in favor of dismissal.  Finally, the court believes that the Debtors lacked sincerity with respect to the amount of payments in their Plan.

The Bankruptcy Court for the Eastern District of Michigan recently addressed the lack of good faith in the context of a motion to dismiss filed by a debtor's ex-spouse, where the debtor had failed satisfy an obligation related to the couple's child.  *In re Larson-Asplund*, --- B.R. ---, 2014 WL 5017833, at \*3 (Bankr. E.D. Mich. Oct. 8, 2014).  The court finds the discussion in *Larson-Asplund* of several factors—the amount of the debtor's proposed payments, the debtor's effort to repay the debt, and the debtor's sincerity in seeking in Chapter 13 relief—to be extremely instructive and persuasive when considered in the context of this case.

In *Larson-Asplund*, the debtor's schedule of unsecured liabilities disclosed that the amount owing under a provision of the divorce judgment exceeded the debtor's other unsecured debts by more than three times, with the other claims being a cell phone bill, two debts for legal

---

[17]   Schedule B did include an entry for "Misc. jewelry" with a value of $1,500.  (Creditor's Ex. 3.)  DCummings testified that her wedding ring contains a diamond of slightly less than one carat and that she believed the amount listed on the Schedules corresponded only to that ring.  (Trial Tr. at p. 111.)

services, a personal loan from the debtor's mother, and a student loan.  *Id.* at *9.  The court found that the proposed distribution of $0.00 to unsecured creditors was inadequate, especially in light of the fact that the ex-spouse held the majority of unsecured claims.  *Id.*

The court in *Larson-Asplund* also noted that the debtor had made only minimal payments on the debt owing to his ex-spouse, and only did so upon being ordered to by the state court.  *Larson-Asplund*, 2014 WL 5017844, at *9.  The debtor sought to reduce the amount of his payments in the state court and amended his schedules to claim an exemption in $10,000 that he had been ordered by the state court to withdraw from his 401(k) and pay to his ex-spouse.  *Id.*  The court found that the debtor's minimal payments, continued efforts to challenge the payments in the state court, the timing of the bankruptcy filing after an unfavorable ruling from the state court, and the debtor's desire to recover the $10,000 demonstrated that the debtor had made little or no effort to repay his ex-spouse and instead had taken great pains to avoid paying her.  *Id.*  The court further determined that the debtor's sincerity was lacking, as there was no evidence that any creditor other than the debtor's ex-spouse had taken any collection action against him.  *Larson-Asplund*, 2014 WL 5017844, at *10.

This case has numerous similarities to *Larson-Asplund*.  The Debtors' Schedule F lists $38,491 in credit card debts, many of which the Debtors testified were used to pay attorneys' fees to contest the Mediation Award and the Support Order.  (Trial Tr. at p. 71, 117; Creditor's Ex. 8.)  The Creditor's claim of $172,252, as listed on the Debtor's schedules, exceeds all other claims by more than four times.  (Creditor's Ex. 8.)

Similar to the debtor in *Larson-Asplund*, the Debtor appears to have made minimal attempts to pay the Creditor beyond the payments deducted automatically from the Debtor's pension.  According to his own Plan, the Debtor was $10,240 in arrears to the Creditor as of the Petition Date.  As in *Larson-Asplund*, the Debtors filed their bankruptcy case only after the Creditor was forced to obtain a writ of garnishment.  (Trial Tr. at p. 110.)

In addition, there is no evidence in the record that any of the Debtors' other creditors had pursued any collection actions against them as of the Petition Date.  Unlike in *Larson-Asplund*, the Debtors in this case are eligible for a discharge.  However, that fact does not suggest, by itself, that a different result from *Larson-Asplund* is required.  The Debtors' choice of Chapter 13, in which a property settlement is dischargeable, as opposed to Chapter 7 where it is not, is seemingly more than coincidental.  *See* 11 U.S.C. § 1328(a)(2) (excluding only domestic support obligations under §523(a)(5) from discharge, not obligations under § 523(a)(15)).  Like the court in *Larson-Asplund*, this court is convinced that the Debtors' Plan is not intended to pay the Debtors' creditors, consistent with the purpose of Chapter 13, but is instead simply a means by which to avoid paying the Creditor in full.  *Larson-Asplund*, 2014 WL 5017844, at *10.

The Debtors sought bankruptcy relief only after the Creditor attempted to garnish their accounts in order to obtain what she was rightfully entitled.  The Debtors now find themselves in the position of not being able to make payments to their creditors, including the Creditor.  As previously noted, instead of paying their creditors, the Debtors decided to spend thousands of dollars disputing the support awarded to the Creditor.  In continuing to dispute the support award, the Debtors not only failed to make payments to the Creditor as required by the

Mediation Award and the Support Order, but also incurred additional debt with, in all likelihood, exorbitant interest rates.[18]

The Debtors' attempt to retain their cottage is also indicative of a lack of good faith. Instead of disposing of their cottage so the Debtor could satisfy his obligations to the Creditor, the Debtors decided to continue to satisfy their own desires.  The Debtors paid $584 per month, or $7,008 per year, toward the mortgage on their cottage.  (Creditor's Ex. 13.)  Cottage expenses do not end with mortgage payments though.   (Creditor's Ex. 20.)   The Debtors paid the aggregate amount of $3,240 per year for cable television, electricity, propane gas, and fuel for a jet ski and boat, all of which related to the cottage.[19]  (Creditor's Ex. 20.)  In total the cottage appears to have cost the Debtors more than $10,000 per year.  These payments were made during the litigation with the Creditor, and continued unimpeded after the Mediation Award was issued and the Support Order entered.  The Debtors were current on their cottage mortgage and other obligations related to the cottage as of the Petition Date.  In fact, DCummings testified that the Debtors planned, until the eve of their bankruptcy, to keep the cottage, if possible, to the detriment of their creditors, and the Creditor in particular.  (Trial Tr. at p. 116.)

The evidence reveals that even after the Debtors filed their petition, they continued to prefer their interests over the interests of their creditors.  In their initial Plan, the Debtors proposed to retain their vehicles (both of which were newly acquired), thereby reducing the disposable income available to unsecured creditors.  Only after the Creditor objected to their proposed retention of both vehicles did the Debtors amend their Plan to surrender one vehicle, which the Debtors purchased for $16,600 a few months before their bankruptcy.[20]

The Debtors also exhibited further self-interest with respect to the claims filed in their bankruptcy case.  At the hearing, the Debtor testified that he gave his son, Bryan Cummings, a mortgage on the cottage in the amount of $110,000 for improvements that Bryan Cummings made to it.  (Trial Tr. at pp. 61-62.)  Yet the Debtor acknowledged that Bryan Cummings was never owed $110,000 -- the claim was actually much less.   (Trial Tr. at pp. 61-62.) Notwithstanding this admission and the designation of Bryan Cummings' secured claim as disputed in the Debtors' Schedule D, the Debtors have not objected to the claim of Bryan Cummings.  (Creditor's Ex. 5.)  Instead, the Debtors' sole objection was to the claim of the Creditor.

Finally, as noted above, according to discovery responses admitted into evidence, the Debtors have incurred more than $22,000 in fees for the services of their divorce attorney, Chris Kroll, since January 1, 2012. (Creditor's Ex. 13.)   The Debtors' budget dated March 30, 2013 indicates the Debtors planned to pay more than $20,000 per year on their credit cards alone for

---

[18]     The Debtors were paying their attorneys by credit card in March 2013, but it is quite possible that this practice began much earlier.  (Ex. 20.)

[19]     It is unclear if the Debtors' "4 wheeler" was located at the cottage.

[20]     The Debtors have elected to keep their 2011 Buick LaCrosse, which they purchased for $23,000 *after* their initial consultation with their bankruptcy attorney on December 30, 2013.  (Creditor's Ex. 13, 26.)

the services of Mr. Kroll.[21]  (Creditor's Ex. 20.)  The Debtor testified at the evidentiary hearing that he owed Mr. Kroll at least $10,000 from the year before the Debtors filed for bankruptcy, but that such amount had been satisfied pursuant to a "verbal agreement."[22]  (Trial Tr. at 71.) The Debtor could not, for whatever reason, explain this agreement other than to say he was current as of the Petition Date.  (Trial Tr. at pp. 67-68.)  Overall, the Debtor struggled to answer related questions and conveniently could not remember details.  (Trial Tr. at p. 67-71.)  In addition, the Debtors paid $5,000 to Mr. Kroll in January 2014 to pursue an appeal. (Trial Tr. at p. 67.)  Despite the Debtors' intention to pursue modification of the Mediation Award and the Support Order post-petition, expenses for attorney fees are conspicuously absent from Schedule J.[23]  (Creditor's Ex. 10.)

The court is troubled to say the least.  The Debtors are seeking to reduce the Creditor's claim through the Chapter 13 bankruptcy process, yet at the same time they are continuing to spend funds on their divorce attorney that could otherwise be used to satisfy creditors.  The Debtors' conduct is not indicative of good faith.  As one court has noted in similar factual circumstances, bankruptcy courts do not sit as courts of appeal to allow recalcitrant debtors to avoid paying on an unsatisfactory divorce judgment in state court.  *See In re Bandini*, 165 B.R. 317, 320 (Bankr. S.D. Fla. 1994) (dismissal appropriate where primary, if not sole, motivation of debtor in filing Chapter 13 was the modification of adverse alimony judgment issued in state court).

Based on the aforementioned factors, this court concludes that the Creditor has satisfied her burden under *Alt*.  Simply put, the Debtors are seeking to abuse the bankruptcy process. While certain factors under *Alt* weigh in favor of the Debtors, these factors are satisfied in many bankruptcy cases.  It is the Debtors' irresponsible and self-serving conduct both before and after they filed for bankruptcy that leads this court to dismiss the Debtors' case for lack of good faith under section 1307(c).[24]

---

[21]   In March 2013, the Debtors budgeted at least $900.00 per month for payment of divorce attorneys' fees on their Citi credit card alone.  The Debtors also apparently paid their divorce attorneys additional amounts in cash. (Creditor's Ex. 13.)

[22]   The Debtors did not disclose any outstanding balance owing as of the petition date to Mr. Kroll on their Schedule F.  (Creditor's Ex. 8.)

[23]   The Debtor's divorce attorney did not disclose his compensation pursuant to section 329(a) and Fed. R. Bankr. P. 2016(b).  *See In re Gorski*, 519 B.R. 67, 72-74 (Bankr. S.D.N.Y. 2014).

[24]   For these reasons and based on *Alt's* adoption of the factors used to determine good faith in *Barrett*, this court concludes that neither the Debtors' plan nor their petition were filed in good faith for purposes of 11 U.S.C. 1325(a)(3) and (7).  *See In re Alt*, 305 F.3d at 419; *In re Barrett*, 964 F.2d at 592; *see also In re Okoreeh-Baah*, 836 F.2d at 1032-33.  Because the Sixth Circuit has suggested that bankruptcy courts be more reluctant to dismiss a case under section 1307(c) than 1325(a), this court's determination that dismissal under section 1307(c) is appropriate also implicates dismissal under section 1325(a).

## CONCLUSION

For the foregoing reasons, the court denies confirmation of the Plan, overrules the Claim Objection, and grants the Motion to Dismiss.  The court will prepare an order consistent with this Memorandum Decision.

**Signed: December 12, 2014**





John T. Gregg
United States Bankruptcy Judge